UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PADGETT BROTHERS LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | )   1:10-cv-00858-RLY-DML |
| A.L. ROSS & SONS, INC., | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Padgett Brothers LLC ("Padgett") is the owner of property contaminated by the type of chlorinated solvents typically used in dry cleaning. Padgett filed the present lawsuit against A.L. Ross & Sons, Inc. ("Ross"), the prior owner of the property that operated such a business, under the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9607(a) ("CERCLA") and the Indiana Environmental Legal Action Statute, Indiana Code §§ 13-30-9-1 *et seq*. ("ELA"), for response costs incurred and to be incurred by Padgett. Padgett now moves for summary judgment with respect to the liability of Ross under both statutes. For the reasons set forth below, the court now **GRANTS** Padgett's motion.

**I.    Background**

On February 7, 1963, Richard E. and Janet L. Ellison acquired the property at issue, located at 1803 West Purdue Road, Muncie, Indiana (the "Site"), by Warranty

deed. (Deposition of John Mundell ("Mundell Dep.") at 28-29; Plaintiff's Ex. 4). In the mid-1960s, the Ellisons started a dry cleaning business at the Site named Norge Village Laundry and Dry Cleaning ("Norge Dry Cleaning"). (Plaintiff's Ex. 8; Deposition of Donald Ross ("Ross Dep.") at 57, 70-71). The make and model of the six or seven coin-operated dry cleaning machines at Norge Dry Cleaning was Norge, Model No. 013-323-3. (Plaintiff's Ex. 20; Deposition of Larry Bousman ("Bousman Dep.") at 16; Second Deposition of Larry Bousman ("Bousman Second Dep.") at 28; Ross Dep. at 59 (testifying that the machines were most likely Norge brand dry cleaning machines)). In addition to dry cleaning machines, Norge Dry Cleaning also had a number of coin-operated washing and drying machines. (Bousman Dep. at 16-17).

In 1970, Ross acquired the Site from the Ellisons and took over the ownership and operation of Norge Dry Cleaning until approximately 1974 or 1975. (Ross Dep. at 57, 70-72). Ross did not change the operation or identity of Norge Dry Cleaning after acquiring it from the Ellisons. (Bousman Dep. at 16; Ross Dep. at 73-74). Ross continued to use the same name, signage, equipment, chemicals (perchloroethylene ("PCE"), employee (named Dorothy), and building configuration, as the Ellisons had. (Ross Dep. at 60, 71, 73-74; Bousman Dep. at 15-16, 21).

Larry Bousman, the former maintenance supervisor of Norge Dry Cleaning while Ross owned the property, testified that the washing and dry cleaning machines sat on a concrete floor. (Bousman Dep. at 30). A concrete trench was located behind each dry cleaning machine, and a large floor drain was located just behind four regular coin-operated washing machines, not far from the concrete trench. (*Id*. at 28, 30). There was a

single exhaust fan between the dry cleaning machines and the washing machines.  (*Id*. at 23-24).  During Bousman's deposition, he provided a schematic of the facility, including the set up of the machines.  (*Id.* at 16-21; Plaintiff's Ex. 10).

PCE was delivered to the facility in a small drum approximately once a month, and was stored onsite next to the dry cleaning machines, near the back door.  (Bousman Dep. at 22-23).  Dorothy hand-pumped the PCE from the drum into a bucket, and then dumped the PCE as needed into a tank located under each dry cleaning machine.  (Bousman Second Dep. at 29-30).  Bousman was unaware of any leaks or spills of PCE during the time Ross owned the dry cleaning business.  (Bousman Dep. at 39-40).

Ross continued to operate other businesses at the Site after it closed Norge Dry Cleaning, including a pharmacy and a hardware store.  (Ross Dep. at 66; Bousman Dep. at 31-32).  On May 2, 2000, Marsh Supermarkets, Inc. ("Marsh") purchased the stock and assets of Ross, including the Site and adjoining property, also owned by Ross at the time.  (Ross Dep. at 34-36).  Marsh sold the Site and adjoining property to an unrelated third non-party in 2007, and Padgett acquired both properties in 2008.  (Plaintiff's Exs. 11-12).  Since 2009, Small Engine Warehouse, Inc.("SEW") has operated a lawn and garden equipment retail and repair store at the Site and adjoining property.  (Deposition of Roy Padgett at 10, 13, 19).

In 2008, a subsurface investigation conducted by Padgett revealed that the soil and groundwater at the Site is contaminated with chlorinated volatile organic compounds (PCE and its breakdown products), a chemical hazardous to human health and the environment.  (Plaintiff's Ex. 14; Plaintiff's Ex. 15 at 9).  Additional investigations

conducted by both Padgett and Ross have confirmed the presence of the contamination in the soil and groundwater at the Site and in groundwater migrating off-Site at concentrations exceeding residential and industrial screening/closure levels set by the Indiana Department of Environmental Management. (Plaintiff's Exs. 15, 16). According to Plaintiff's expert, environmental consultant John Mundell, the contamination represents an unacceptable risk and threat to human health and the environment. (Plaintiff's Ex. 17 at 23).

There is no evidence that any business located on the Site, except Norge Dry Cleaning, used PCE. (*Id.* at 7). Mundell opined that, based upon his knowledge and understanding of the design of dry cleaners designed and manufactured by Norge Corporation in the early 1960s, and based on the deposition testimony of Bousman and Ross reflecting that Ross did not alter the business operations of Norge Dry Cleaning after its acquisition in 1970, "[i]t is highly likely" that releases of PCE during Ross's ownership and operation of Norge Dry Cleaning. (*See id*. at 23). Defendant's rebuttal expert, environmental consultant Mark Flavin, opined that there are insufficient facts and evidence to support Mundell's opinion, and that he cannot say, to a reasonable degree of scientific certainty, that a release of PCE occurred during Ross's ownership of the facility. (Defendant's Ex. 5 at 9-10). Neither party objects to the qualifications of these experts or the relevance of their opinions.

Padgett has incurred and will continue to incur costs, expenses and fees as a result of the contamination. (Affidavit of Roy Padgett at 1).

All other facts necessary for this opinion will be addressed in the Discussion Section.

## II. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. In deciding whether a genuine issue of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).

The burden is upon the movant to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the non-moving party may not rest upon the pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Becker v. Tenenbaun-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990).

### III. Discussion

#### A. CERCLA § 107

CERCLA § 107(a), 42 U.S.C. § 9607(a), establishes liability and permits a cause of action for cost recovery by a party that incurs costs to "clean up" a contaminated site. This right of recovery includes not only costs that have already been incurred, but also future costs for completion of the clean-up. *City of Gary, Indiana v. Shafer*, 683 F.Supp.2d 836, 852 (N.D. Ind. 2010). CERCLA liability attaches if the plaintiff establishes the following four elements: (1) the site in question is a "facility" – i.e., a site or area where a hazardous substance has been disposed of; (2) a release or threatened release of a hazardous substance at or from the facility has occurred; (3) the release or threatened release has resulted in response costs; and (4) the defendant is a "responsible party." *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008) (citations omitted). Liability under § 107(a) is strict – the innocence of the defendant is irrelevant. *Harley-Davidson, Inc. v. Ministar, Inc.*, 41 F.3d 341, 343 (7th Cir. 1994) (citations omitted).

The issue in dispute is whether Ross is a "responsible party." A "responsible party" is defined as, *inter alia*, "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Ross admits that it operated a coin-operated dry cleaning facility from approximately 1970-1974 or 1975 and that its dry cleaners used PCE. Ross maintains, however, that there is no evidence that a disposal of PCE occurred during that time period. In support of this argument, Ross challenges the opinion of

Padgett's expert, John Mundell. Before addressing Ross's specific objections, the court will give a brief synopsis of Mundell's opinion.

### 1. Mundell's Opinion

Mundell submitted an expert report with seven delineated opinions. (Plaintiff's Ex. 17). In pertinent part, he opined that Norge Dry Cleaning appeared to have been part of a nationwide chain setup by the Norge Corporation, a manufacturer and franchisor of dry cleaning equipment. (*Id*. at 24). Norge typically provided and installed both the dry cleaning equipment, and the plans for equipment arrangements, including discharge of the machine to sewers and drain lines. (*Id*.) In these machines, the water from PCE-water separators is in direct contact with pure product PCE in the machine storage tank. (*Id*.). Based on Mundell's research, discharge of PCE-laden waters into sewer systems and dry wells is one of the most significant release mechanisms of PCE to the environment from dry cleaners. (*Id*.). According to Mundell, although no testing was ever performed on the discharge wastewaters from Norge Dry Cleaning, given his knowledge and experience in this area, Mundell opines it is likely that contamination of the Site occurred through, *inter alia*, breaks or cracks in the sewer pipes. (*Id*.).

Second, Mundell opined that releases of PCE onto the floor from spillage while filling the dry cleaning machines or from general use of the machines would have ended up in the trench drain or outside of the back door, leading to contamination of the subsurface soils and groundwaters. (*Id*. at 22). "The location of PCE product storage, dry cleaning machines, and floor drains match almost perfectly with the area of the most

significant PCE soil impacts that have been detected beneath and adjacent to the building." (*Id.*).

Lastly, Mundell opined that "it is highly likely" that PCE was released into the subsurface soils and groundwater during Ross's ownership and operation of the Norge Dry Cleaner. (*Id.* at 23). Mundell based his opinion on the deposition testimony of Ross's 30(b)(6) witness, Donald Ross, and Bousman stating that Ross operated the dry cleaning business in the same manner as the prior owners, the Ellisons. (*Id.* at 24).

Ross objects to Mundell's opinion based in part on Mundell's assumption of the make, model, and design of the dry cleaners (1961 model from the Norge Corporation), and his assumptions that the design of the dry cleaner led to releases of PCE from the Site into the soil and groundwater during the time period Ross owned the property. Ross's objections really go to the reliability of Mundell's opinion, requiring a truncated *Daubert* analysis from the court.

Expert testimony is governed by Rule 702 of the Rules of Evidence and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Smith v. Ford Motor Co.,* 215 F.3d 713, 717-18 (7th Cir. 2000). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

### a.     Make, Model and Design of the Dry Cleaners

Figure 8 of Mundell's opinion features a schematic of a 1961 version of the Norge brand dry cleaner, entitled "Typical Norge Coin-Operated Dry to Dry Unit from the early 1960s (Norge, 1961)," taken from a Norge Sales Corporation, Service Instruction and Parts Catalog, published in 1961.  At the time Mundell submitted his expert opinion, Padgett was not in possession of the make and model of the dry cleaning machines installed at Norge Dry Cleaning.  After Ross filed its Response Brief, Ross produced historical corporate documents which identified the model of the dry cleaning equipment operated by Ross at the Site.  (Plaintiff's Ex. 20 at ALR 00911) (reflecting the model number as #013-323-3).  Padgett conducted additional discovery and obtained the Installation and Operating Instructions for the Norge Dry Cleaning System,  Model 013-323-3, dated 1961, from the Maytag Corporation in unrelated litigation pending in the Marion Superior Court, Environmental Division, *Chuck Markey, et al. v. George F. Kopetsky, et al.*, Cause No. 49F12-0607-PL-028561. (Plaintiff's Ex. 25).  Padgett claims this 1961 Norge product manual confirms the make and model of the Norge dry cleaning machines at issue, and therefore supports Mundell's opinion as to the manner in which the PCE-laden wastewater was released at the Site.

In its Surreply, Ross claims that the 1961 Norge product manual is inadmissible because it has not been properly authenticated by a Maytag or Borg Warner (successors to the Norge Corporation) document custodian.  Moreover, according to Ross, there is no indication that it is a true, accurate, and complete copy of the 1961 product manual.

To authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). Rule 901(b)(8) governs the means by which an ancient document is authenticated. To be admissible, there must be evidence that it "(A) is in a condition that creates no suspicion about its authenticity; (B) was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when offered." FED. R. EVID. 901(b)(8).

The product manual is designated as Plaintiff's Ex. 25. Ross argues in a footnote that: (1) the Table of Contents does not reference pages numbered 38A and 50A-50F, (2) the Table of Contents for pages 82-83 does not match up with pages 82-83 as submitted, and (3) page 51 appears to be newer than the other pages. As noted by Ross, page 50F matches up to page 50 in the Table of Contents, leading the court to wonder whether pages 50A-50F were added as a supplement to the 1961 product manual at a later date. The court agrees with Ross with respect to its other two observations (labeled (2) and (3) above). In all other respects, the product manual submitted as Plaintiff's Ex. 25 appears to be a true and accurate copy of the 1961 product manual. Additionally, the 1961 product manual was produced by Maytag, the company where it would likely be stored, and is older than 20 years old. As further evidence of the manual's authenticity, the court notes that Figure 8 of Mundell's expert report is an exact copy of the dry cleaning machine depicted in the 1961 product manual. (*Compare* Plaintiff's Ex. 17, Appx. A, Figure 8, *with* Plaintiff's Ex. 25 at BW00630). The court therefore finds, for purposes of this motion, that the 1961 product manual, absent the pages noted above, is what it purports to be. As such, Mundell's opinion, which relies on a 1960s version of the

Norge[1] Dry Cleaning machines, is not based upon impermissible assumptions of the underlying facts.

### b. Design of the Dry Cleaner

Next, Ross challenges Mundell's opinion with respect to the release of PCE with the machines' wastewater as being solely dependent on the design, installation, and arrangement of the machines as set forth in the 1961 product manual. (*See* Plaintiff's Ex. 17 at 24 ("Norge typically provided and installed both the dry cleaning equipment, and the plans for equipment arrangements, including discharge of the machine to sewers and drain lines.")). Ross claims there is no evidence that the machines were installed in conformance with the 1961 product manual; thus, according to Ross, Mundell's opinion is based on erroneous facts and assumptions. For example, there is no evidence that there was a "bank" of eight dry cleaning machines, no evidence the floor drain was located in the vicinity of the dry cleaners into which wastewater would flow into an underground storage tank, and no evidence that exhaust fans were attached to each machine (Bousman testified there was one exhaust fan at pages 23-24 of his deposition), among other things. (*See* Plaintiff's Ex. 25 at BW00650-56).

The fact that, 40 years after Norge Dry Cleaning closed, Bousman's memory of the set up of Norge Dry Cleaning was not in perfect conformance with the installation

---

[1] Before Mundell issued his expert report, he reviewed the deposition testimony of Bousman and Ross. (Plaintiff's Ex. 17 at 13-14). Ross testified at that time that he thought the dry cleaning machines were a Norge brand product. (Ross Dep. at 59). In addition, based on Mundell's knowledge and understanding of the Norge Corporation, he reasonably inferred that Norge Dry Cleaning used Norge dry cleaning machines. (Plaintiff's Ex. 17 at 24). Thus, even if the 1961 product manual were not in evidence, the court would still find Mundell's assumption that the dry cleaners were Norge brand machines a permissible assumption.

instructions contained within the 1961 Norge product manual, does not call into question the ultimate reliability of Mundell's opinion regarding the manner in which PCE was released into the environment. As noted above, Mundell's opinion was based on the design of the Norge dry cleaner itself, which allowed PCE to intermix with the water in PCE-water separators in the machine storage tank. Because the machines were dependent on water, the machine had to discharge the wastewater into Muncie's sewer lines *somehow*. Moreover, Ross's rebuttal expert, Mark Flavin, testified that PCE can penetrate concrete and migrate through floor cracks. (Plaintiff's Ex. 22 at 147). Thus, PCE could have penetrated the soil and groundwater through a means other than the sewer system.

   Furthermore, if Bousman's memory is correct and the dry cleaning machines were not installed according to plan, one could reasonably argue that it is *more* likely, not less likely, that PCE was released into the environment from those machines. Indeed, the manual specifies the recommended set up to *prevent* such releases. (*See id.* at 650 (showing, with diagrams, in a section entitled "Recommended Solvent Emergency Storage System for Dry Cleaning Installations," the recommended means to "salvage Dry Cleaning Solvent that might leak from a Dry Cleaning System due to an accident or possible failure of a part," including the installation of a diked area and underground storage tank)). In addition, Flavin testified that the chlorinated volatile organic compounds found in the soil and groundwater at the Site "most likely" came from "historical dry cleaning operations"; he just could not opine *when* that may have occurred. (Deposition of Mark Flavin ("Flavin Dep.") at 63-64, 133, 147, 156, 161).

The court therefore finds that Mundell's opinion is not dependent on the exact machine configuration disclosed in the 1961 Norge product manual and is, therefore, reliable.

**2.     Merits**

Without going into excessive detail, Flavin submitted an expert report to rebut the opinions of Mundell.  (*See* Defendant's Ex. 5, Ex. A).  In his report, Flavin criticizes Mundell for failing to consider "any number of additional possibilities for how PCE was allowed to enter the subsurface beneath the site," including equipment failure, equipment/machine operation, equipment maintenance, and the like.  (*Id.* at 18).  Flavin also criticizes Mundell's opinion to the extent he opines that releases occurred during the time Ross owned and operated Norge Dry Cleaning, stating that the evidence is insufficient to support such a finding.  (*Id.* at 9-10).  Per Flavin, there is no evidence in the historical resources available indicating that there were any "spills or releases, improper chemical handling or storage, intentional or unintentional chemical dumping, or any other equipment upset or failure" leading to a release of PCE into the subsurface beneath the Site either before or after Ross took ownership.  (*Id.* at 9).

Flavin's objections are largely irrelevant.  The fact remains that a release of PCE occurred, and Norge Dry Cleaner is the only entity that could have contaminated the property with that dry cleaning solvent.  The material and dispositive issue here is when that release occurred.  On this issue, Flavin essentially gives no opinion, as evidence by his testimony:

> Q:     Do you agree that the contamination at this site happened sometime between the 1960s and the 1970s?

> A: I think it's most likely that it did.
>
> Q: Do you have any opinion as to when in that time frame the contamination occurred?
>
> A: No.
>
> Q: So your opinion doesn't say that contamination did not occur after 1970, correct?
>
> A: Correct.
>
> Q: You're just saying you don't know?
>
> A: That's correct.

(Flavin Dep. at 133).

In sum, the parties agree the release of PCE could have only occurred from Norge Dry Cleaning. Ross acquired the dry cleaning operation from the Ellisons in 1970, and operated it in the same manner, with the same machines, and with the same dry cleaning chemicals (PCE) as the Ellisons. Those chemicals are the same chemicals now found in the subsurface on-Site and, due to migration, off-Site. In the face of that compelling evidence, and in the absence of a contrary opinion as to an alternative release date, the court finds there is no genuine issue of material fact as to the liability of Ross under CERCLA § 107, and summary judgment on liability in favor of Padgett must be granted.

**B.     ELA Claim**

Indiana's ELA statute provides for an "environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action" involving hazardous substances, like PCE. IND. CODE § 13-30-9-2. This statutory section "is analogous to CERCLA's §107(a) cost-recovery provision."

14

*Armstrong Cleaners, Inc. v. Erie Ins. Exch.*, 364 F.Supp.2d 797, 813 n.10 (S.D. Ind. 2005). A person must also demonstrate that the released substance "poses a risk to human health and the environment." IND. CODE § 13-30-9-2; *Reed v. Reid*, 980 N.E.2d 277, 287 (Ind. 2012).

The analysis of this claim is virtually the same as the analysis set forth above with respect to Padgett's CERCLA § 107(a) claim. Therefore, for the same reasons, the court finds Ross caused and/or contributed to the release of PCE at and from the Site, and that the evidence reflects the contamination caused an unacceptable risk to human health and the environment. Accordingly, summary judgment in favor of Padgett on liability must be granted.

### IV. Conclusion

For the reasons set forth above, the court **GRANTS** Padgett Brother's Motion for Summary Judgment on Liability (Docket # 67).

**SO ORDERED** this 3rd day of September 2013.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.