UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PADGETT BROTHERS LLC,           )
                               )
        Plaintiff,             )
                               )
    vs.                        )      1:10-cv-00858-RLY-DML
                               )
A.L. ROSS & SONS, INC.,        )
                               )
        Defendant.             )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Padgett Brothers LLC ("Padgett Brothers") is the owner of property contaminated

by the type of chlorinated solvents typically used in dry cleaning. Padgett Brothers filed

the present lawsuit against A.L. Ross & Sons, Inc. ("Ross"), the prior owner of the

property that operated such a business, under the Comprehensive Environmental

Response Compensation and Liability Act, 42 U.S.C. § 9601 *et seq*., ("CERCLA") and

the Indiana Environmental Legal Action Statute, Indiana Code §§ 13-30-9-1 *et seq*.

("ELA"), for response costs incurred and to be incurred by Padgett Brothers. Ross

asserted a counterclaim against Padgett Brothers under 42 U.S.C. § 9613. On September

3, 2013, the court granted summary judgment in favor of Padgett Brothers on Ross's

liability under both CERCLA § 107 and the ELA. (Docket # 90). On November 19,

2013, the court held a hearing to determine the appropriate damages that Ross owed to

Padgett Brothers. Being duly advised, the court now enters its Findings of Fact and

Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

1

# I. FINDINGS OF FACT

## A. Ownership and Use of Property

### 1. Ellisons

1. On February 7, 1963, Richard E. Ellison and Janet L. Ellison acquired the property at issue, located at 1803 West Purdue Road, Muncie, Indiana (the "Site"), by Warranty Deed from Alfred E. Ellison and Mary M. Ellison. (Trial Ex. 37).

2. Richard Ellison, now deceased, operated Norge Village Laundry & Cleaners ("Norge Dry Cleaning") at the Site from at least some time in 1964. (Joint Stipulations of Facts ("Joint Stip.") ¶ 4; Trial Ex. 20 at 11). The city directories of Muncie listed Norge Dry Cleaning at the Site from 1962 to 1974. (Transcript of the Damages Hearing ("Trial Tr.") at 118). In contrast, other directories, including the EDR City Directory, stated that Norge Dry Cleaning began operations at the Site starting in at least 1964. (Trial Ex. 4 at 2; Trial Ex. 20 at 11).

### 2. Ross

3. The Ellisons sold Norge Dry Cleaning's assets and the Site to Ross on December 21, 1970. (Joint Stip. ¶ 4).

4. Ross inspected the machines and the inside of the building before purchasing it. (Trial Tr. at 140-41). When Ross purchased the property, it was not aware of any environmental issues at the Site. (*Id*. at 143).

5. Ross continued to operate Norge Dry Cleaning at the Site from December 21, 1970 until approximately 1974 or 1975. (Joint Stip. ¶ 3).

**6.** Ross continued to use the same Norge Dry Cleaning name, signage, equipment, chemicals (perchloroethylene ("PCE")), employee, and building configuration as the prior owner. (*Id*. at ¶ 5; Trial Tr. at 145).

**7.** Ross and its employees conducted general maintenance on the dry cleaners and inspected them on a regular basis. (Trial Tr. at 143). Ross did not conduct any preventative maintenance with the machines, nor was any formal protocol in place for reporting any PCE spills. (*Id*. at 146).

**8.** After closing Norge Dry Cleaning, Ross continued to operate other businesses at the Site, including a pharmacy and hardware store. (*Id*. at 118, 142).

**9.** When Ross owned the Site, it did not investigate and/or address the PCE and its breakdown compounds in soil and groundwater. (Joint Stip. ¶ 8). The first time Ross investigated the PCE and the breakdown compounds in the soil and groundwater occurred in February 2012. (*Id*. at ¶ 9).

**10.** Ross owned the property located at the Site until December 27, 2007, when he sold it and a contiguous parcel that totaled approximately 4.79 acres for $385,000 to an unrelated non-party. (*Id*. at ¶¶ 1, 10).

### 3. Padgett Brothers

**11.** In May 2008, an unrelated non-party sold the Site and the contiguous parcel to Padgett Brothers for $590,000 in cash. (*Id*. at ¶ 11; Trial Tr. at 10). Padgett Brothers still owns this land. (Joint Stip. ¶ 2).

12. Padgett Brothers did not have actual knowledge that the Site was contaminated when it purchased it, nor were any reductions in price made for environmental concerns. (Trial Tr. at 11-12).

13. Padgett Brothers leases the land to an operating company, Small Engine Warehouse ("SEW"). (*Id*. at 6).

14. SEW started operating at the Site in 2009. (*Id*. at 18). SEW is a lawn-and-garden retailer that sells lawnmowers, snow blowers, gas, and other equipment. (*Id*. at 10). SEW also rents and repairs equipment, but it does not manufacture any equipment or products. (*Id*. at 10, 18).

15. Neither Padgett Brothers nor SEW has ever operated a dry cleaning business at the Site or used any PCE at the Site. (*Id*. at 19; Joint Stip. ¶¶ 6, 12).

    **B. PCE**

16. The court previously concluded that during the operations of Norge Dry Cleaning – by both the Ellisons and Ross – PCE was released on-site as a result of, *inter alia*, the design of the Norge PCE water separator and the vapors which were given off from the opening and closings of the dry cleaner during its operation. (Entry on Summary Judgment 7-8). Moreover, when the PCE was released, it went into the sewer line and ultimately into the environment through cracks or joint separations in the sewer line. (*Id.*).

17. PCE is a hazardous substance under CERCLA and the ELA. (Joint Stip. ¶ 7). The United States Environmental Protection Agency ("EPA") considers PCE to be a likely carcinogen to humans. (Trial Tr. at 96).

**18.** Potential issues with PCE contamination include vapor intrusion. Vapor intrusion is the process where contaminants that are present in groundwater can migrate from the groundwater up through the soil and into nearby structures, homes, or businesses through cracks or defects in the basement flooring and into the indoor air. (*Id*. at 54, 94-95). The EPA stated breathing PCE vapor intrusion over long periods of time could cause negative health effects in humans. (*Id*. at 95; Trial Ex. 19). The primary effects are neurological, including impaired cognitive and motor neurobehavioral performance; in addition, studies of persons exposed to PCE in the workplace have found associations with several types of cancer, including bladder cancer, non-Hodgkin lymphoma, and multiple myeloma. (Trial Ex. 19).

**19.** Another potential hazard relates to a PCE plume's ability to migrate long distances over time. (Trial Tr. at 113). A plume is an area of groundwater contamination underneath a site. (*Id*. at 53). The movement of a plume is very important because it can stay on the property or migrate off the property boundaries. (*Id*.). Several factors determine how long it takes for a PCE plume to stabilize, including the subsurface soil conditions, the extent of sand and gravel through which the PCE is moving, the size of the original source, and whether it is an active source. (*Id*. at 125-26).

**20.** PCE breaks down during a process called dechlorination. This occurs when chlorine atoms jump off the PCE molecule; the PCE molecule then breaks down into other chemicals and, ultimately, into lesser nontoxic forms beyond vinyl chloride. (*Id*. at 96). This can be a slow process. Indeed, PCE remains in the ground at the Site

almost 40 years after dry cleaning operations have ceased because the amount released at the Site has not broken down fast enough. (*Id*. at 97). Thus, active remediation is needed to reduce the levels of human health risk at the Site to acceptable levels. (*Id*.).

**C. Initial Environmental Assessment of Site**

### 1. May 2006: Phase I Assessment by Environ

**21.** At the time of purchase, Padgett Brothers had a Phase I Environmental Site Assessment conducted by Environ in May 2006. (*Id*. at 12-13; Trial Ex. 3). Environ also created a significantly more in-depth report, but Padgett Brothers only had the first 30 pages of the report prior to purchasing the Site. (Trial Tr. at 13; *compare* Trial Ex. 3 *with* Trial Ex. 4). Padgett Brothers and its business attorney reviewed the Phase I report, but found "there didn't appear to be anything to be concerned about" because the report did not affirmatively state that the Site was contaminated. (Trial Tr. at 14).

**22.** Specifically, the report states:

> Norge Village Laundry and Dry Cleaning facility operated out of the secondary building on the site from at least 1964 to 1979. No further information is available regarding this business. Although ENVIRON's review did not identify information or documentation that would suggest that a release of hazardous materials has occurred at the site, the aforementioned dry cleaning establishment operated during a time period when there were limited environmental regulations governing the proper management and disposal of hazardous materials. Given that these historic dry cleaning activities likely involved the use of significant quantities of hazardous materials (chlorinated solvents), the potential for soil/ground water contamination exists.

(Trial Ex. 3 at 12; *see also id*. at 2 (same)).

23. After reviewing the Phase I report, Padgett Brothers did not conduct any further investigation as to any potential contamination on the Site. (Trial Tr. at 38).

24. Padgett Brothers did not know that the presence of a dry cleaner created the possibility of contamination. (*Id*. at 15). If Padgett Brothers knew about the contamination, it would not have purchased the Site for any price. (*Id*. at 15-16).

### 2. July 2008: Phase II Assessment by August Mack

25. When Padgett Brothers later sought financing from its bank for renovations, the bank requested a Phase II environmental assessment from August Mack. (*Id*. at 37-38). A Phase II assessment is an environmental investigation where one undertakes site-sampling activities to actually determine whether contamination is present on the site, and, if present, to determine to some degree the type, severity, and extent of the impacts. (*Id*. at 70).

26. In July 2008, Padgett Brothers received the Phase II Report and discovered for the first time that the Site was contaminated. (*Id*. at 16-17, 37-38; Trial Ex. 5). Specifically, August Mack determined there were chlorinated solvent impacts on the Site, including PCE. (Trial Tr. at 70).

27. The Phase II Report did not, however, delineate the contamination. (*Id*. at 74). Delineation involves investigating both horizontally and vertically the extent of contamination. (*Id*. at 73). This involves determining the source of the contamination and then stepping out in each direction to determine where the soil and

groundwater are no longer impacted.  (*Id*.).  As a result, Padgett Brothers did not

know of any off-site contamination when it received the Phase II Report.  (*Id*. at 43).

28. The bank denied Padgett Brothers financing because it refused to use the

contaminated property as collateral.  (*Id*. at 17).

29. Upon discovery of contamination on the Site, Padgett Brothers did not report the

contamination to IDEM, EPA, or any governmental authority, nor did it request

August Mack to perform additional analysis.  (*Id*. at 39-40).  Padgett Brothers instead

sought counsel to locate the responsible parties to clean up the Site.  (*Id*. at 26).

Padgett Brothers made demands on Ross in 2009 before ultimately filing this lawsuit

in 2010.  (*Id*.).

**D. Renovations by Padgett Brothers**

30. After purchasing the Site, Padgett Brothers spent approximately $1.2 million on

renovations to the buildings at the Site, including a new roof, new heating and air-

conditioning system, and demolition of equipment inside the building.  (*Id*. at 11, 19).

31. In 2009, Padgett Brothers installed a catch basin inside one of the buildings to aid in

cleaning the rental and customer equipment.  (*Id*. at 19-20).  This allowed mud, grass,

and dirt to fall into the catch basin instead of being sent to the city sewer.  (*Id*. at 20).

The water would go through the catch basin and ultimately into the city sewer.  (*Id*.).

32. This is the only subsurface work Padgett Brothers performed during its renovation of

the Site, as it required removal of soil.  (*Id*. at 21-22).

33. Because Padgett Brothers knew the soil could be potentially contaminated, it asked

August Mack its recommendation for how to handle the soil.  (*Id*. at 24).  Based on

8

this advice, Padgett Brothers installed a concrete containment system on the west side of the building to hold the soil.  (*Id*. at 22-23).  This consisted of placing the dirt on top of a plastic sheet which covered the asphalt.  (*Id*. at 23).

34.  Padgett Brothers neither had knowledge nor did anyone tell them that the soil they moved was actually contaminated.  (*Id*. at 24).  Nevertheless, it treated the removed soil as if it were contaminated.  (*Id*. at 44).  Later testing on this soil revealed no detection of contamination.  (*Id*. at 102-03).

35.  Additionally, Padgett Brothers cut into and removed concrete from the smaller building on the Site to install a shallow trench drain about four to five inches wide.  (*Id*. at 22, 38).  This drain is connected to the city sewer system and is used to wash down the floors and equipment with water.  (*Id*. at 39).

36.  Data taken from soil collected beneath the building in the area of the trench drain indicated that the soil below the building in this vicinity was impacted but only at deeper depths than where the trench was dug.  (*Id*. at 104, 124-25).  Thus, the soil did not show it was impacted by chlorinated solvents at any concentration for the depth the trenching occurred.  (*Id*. at 124-25).

**E. Subsequent Environmental Assessments of Site**

**1.  February 2012: Phase II Assessment by Environ**

37.  Environ first performed Phase II work in February 2012.  (*Id*. at 76-77).  Environ is Ross's environmental consultant.  (*Id*. at 75).

**38.** Environ put in six soil borings[1] along with six monitoring wells[2] into these soil

borings. (*Id*. at 168). One of these wells, installed in July 2012, was off-site to the

northwest. (*Id*. at 77).

**39.** Environ's stated objectives were to (1) confirm the presence of dry-cleaning-related

compounds in the soil and groundwater at the Site; and (2) delineate any soil and/or

groundwater contamination. (*Id*. at 75). Although Environ confirmed there were dry

cleaning compound impacts in soil and groundwater, it did not delineate the soil and

groundwater contamination. (*Id*. at 76, 168-69).

### 2. August 2012: Phase II Assessment by Mundell & Associates

**40.** In August 2012, Padgett Brothers hired Mundell & Associates ("Mundell") to

perform additional Phase II testing. (*Id*. at 28, 84).

**41.** John Mundell testified for Padgett Brothers as an expert in, among other things, soil

and groundwater contamination. (*Id*. at 66-68).

**42.** Prior to Mundell's investigation, August Mack and Environ had completed 11

borings and five monitoring wells. (*Id*. at 84). Based on the data gathered as of

August 2012, Mundell determined that one could not know the extent of soil or

groundwater contamination. (*Id*. at 83). Indeed, Mundell determined that the

---

[1] A soil boring involves hydraulically pushing a metal tube into the ground to a certain depth and then collecting the soil to examine its composition. (Trial Tr. at 71).
[2] A monitoring well is a vertical pipe, usually PVC, that has a screen at the bottom which allows water to flow into the well. (Trial Tr. at 77). This well is then surveyed and available for sampling anytime in the future by any party. (*Id*.).

delineation had not happened yet at the Site, as the horizontal and vertical limits of the plume had not been determined. (*Id*. at 82).

43. Mundell conducted additional testing of soil and groundwater further from the Site and off-site to determine the extent of contamination. (*Id*. at 29; Trial Ex. 12). In particular, Mundell placed a total of 63 borings in the area, both on-site and off-site, to support delineation. (Trial Tr. at 84). Based on these soil borings, Mundell was able to delineate the soil impacts. (*Id*. at 89). Mundell's investigation also focused on sewer lines, as they are notorious for causing or distributing impacts. (*Id*.). This groundwater sampling revealed high concentrations of PCE off-site, and, as a result, Mundell needed to do further delineation. (*Id*. at 91-92).

44. Because of the high levels of PCE, Mundell hypothesized that the same amount of investigation and remediation would have been required even if only a quarter of the PCE discharged from Norge Dry Cleaning had been released at the Site. (*Id*. at 106-07). This stems from the large problems that small amounts of chlorinated solvents can create and thus would also require remediation. (*Id*.)

45. In September 2013, Mundell conducted additional off-site work, including a vapor intrusion evaluation to determine whether off-site PCE contamination was causing issues with indoor air for nearby residents and businesses. (*Id*. at 99).

46. Mundell has not been able to determine whether the PCE plume has migrated since 2008. (*Id*. at 126).

**47.** Mundell planned on going back to the off-site properties to conduct another round of vapor investigation, including testing of the same residences along with additional homes. (*Id*. at 115-16).

**F. Indiana Department of Environmental Management**

**48.** In April 2013, Padgett Brothers entered the Site into Indiana Department of Environmental Management's ("IDEM") Voluntary Remediation Program ("VRP") for cleaning up contamination both on- and off-site. (Joint Stip. ¶ 13; Trial Tr. at 30).

**49.** VRP is based on a state statute, and it allows one to address contamination on a site. Ind. Code § 13-25-5. IDEM provides regulatory oversight for the party, and the party gets liability protection for the cleanup or remediation they have done. (Trial Tr. at 46).

**50.** IDEM requires Padgett Brothers to follow the Remediation Closure Guide in completing its work under the VRP. (*Id*. at 57-58). The Remediation Closure Guide provides applicants guidance for how contaminated sites should be investigated and addressed. (*Id*. at 52). For example, it includes screening values based on the risk a particular contaminant poses. (*Id.* at 52-53).

**51.** As part of participating in VRP, Padgett Brothers and IDEM entered into a Voluntary Remediation Agreement ("VRA") in July 2013. (Joint Stip. ¶ 15). According to these terms, IDEM and Padgett Brothers "enter into this Agreement pursuant to IC 13-25-5-8 for the purposes of remediating the release of hazardous substances" at the Site. (*Id*. at ¶ 16). Ross is not a party to the VRA. (Trial Tr. at 57).

**52.** Among other things, the VRA required Padgett Brothers to conduct a full investigation and delineation of the extent of contamination specifically as it pertains to contamination that migrated beyond the property boundaries and then submit a report to IDEM within 60 days of the execution date of the agreement. (*Id.* at 58; Trial Ex. 9, Ex. A).

**53.** Padgett Brothers must also submit to IDEM a Remediation Work Plan ("RWP"), which lays out the remedial approach. (Trial Tr. at 50). The RWP is subject to IDEM's approval. (*Id.* at 48-50; Joint Stip. ¶ 18).

**54.** IDEM would not disapprove of cleanups that went above and beyond requirements in the Remediation Closure Guide, as its main concern is that impacts to human health and the environment are addressed appropriately. (Trial Tr. at 60-61). As such, IDEM does not review or approve line-by-line costs of consultants. (*Id.* at 61).

**55.** Padgett Brothers must complete the RWP pursuant to a schedule proscribed by IDEM. (Joint Stip. ¶ 18). IDEM determines whether enough investigation, monitoring, and remediation have been completed. (Trial Tr. at 109). A Certificate of Completion is then issued to the applicant and a covenant not to sue is signed by the governor. (*Id.* at 51).

**G. Costs**

**56.** Under the VRA, IDEM charges Padgett Brothers for IDEM's administrative and oversight costs. (*Id.*; Joint Stip. ¶ 19). The administrative costs charged by IDEM for VRP oversight are consistent with the National Contingency Plan ("NCP"). (Joint Stip. ¶ 20).

**57.** Padgett Brothers paid $920 to build the contaminant area to store the soil removed when creating the catch basin. (Trial Tr. at 25; Trial Ex. 7).

**58.** In addition, Environ's prior investigation left drums of contaminated soil on the property, which still require disposal. (Trial Tr. at 107). The levels of PCE in these drums are very high, so it is not possible to just send the drums to a clean-fill site; instead, they will likely need to go through some type of treatment and then to a licensed facility. (*Id*. at 108). These actions could be very expensive. (*Id*.).

**59.** An unknown amount of additional costs will be necessary to investigate and/or address the contamination both on- and off-site to remediate the Site and achieve the goals of the RWP. (Joint Stip. ¶ 21; Trial Tr. at 107).

**60.** Ross has not paid Padgett Brothers or SEW anything in relation to expenses paid to address the contamination on the Site. (Trial Tr. at 34).

**H. Mark Flavin**

**61.** Mark Flavin, an environmental consultant with Environ, testified as an expert for Ross. (*Id*. at 150-51). Flavin assessed, among other things, whether Mundell's investigation costs were reasonable and necessary, whether Padgett Brothers contributed to the spread of the contamination, and whether future costs could be reasonably determined at this time.

**62.** Flavin's opinion and all other facts necessary for this Entry will be addressed below in the Conclusions of Law.

## II. CONCLUSIONS OF LAW

### A. CERCLA

**63.** Congress enacted CERCLA to "promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington Northern and Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 602 (2009) (internal quotations and citations omitted).

### 1. Section 107(a)

**64.** Section 107(a) of CERCLA provides a private right of action for the recovery of cleanup costs in certain circumstances against four classes of potentially responsible persons ("PRP"). 42 U.S.C. § 9607; *Evansville Greenway and Remediation Trust v. Southern Indiana Gas and Electric Company, Inc., et al.*, 661 F.Supp.2d 989, 994 (S.D. Ind. 2009).

**65.** Liability under this section is strict, as the fault or innocence of the defendant is irrelevant. *Harley-Davidson, Inc. v. Ministar, Inc.*, 41 F.3d 341, 343 (7th Cir. 1994).

**66.** Once an entity is determined to be a PRP, it is typically jointly and severally liable[3] for all costs of removal or remediation by a governmental entity and for response costs incurred by any other person. 42 U.S.C. § 9607(a)(4)(A),(B); *U.S. v. Capital Tax Corp.*, 545 F.3d 525, 534 (2008); *see also Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 161 (2004). This allows the government or another party who has incurred cleanup costs to "follow the path of least resistance by suing

---

[3] Joint and several liability means "each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm." Restatement (Second) of Torts § 875.

only one or only a few PRPs for all of the costs." *Evansville Greenway*, 661

F.Supp.2d at 995.

**67.** Although Congress imposed a strict liability standard, it did not mandate joint and

several liability in every case. *Burlington*, 556 U.S. at 613. To that end, "if a liable

party can establish that the harm is divisible – that is, that there is a reasonable means

of apportioning the harm among the responsible parties – then that party is not

subject to joint and several liability." *Capital Tax*, 545 F.3d at 534; *see also*

*Burlington*, 556 U.S. at 614.

**68.** The court conducts a two-part test to determine divisibility: (1) it determines whether

the harm at issue is theoretically capable of apportionment; and (2) if the harm is

capable of apportionment, the fact-finder must determine how actually to apportion

the damages. *United States v. NCR Corp.*, 688 F.3d 833, 838 (7th Cir. 2012).

### a. Theoretically Capable of Apportionment

**69.** The court looks to common law to determine whether the harm is divisible. *Id*. at

838. The Supreme Court and the Seventh Circuit have both largely relied on the

Restatement (Second) of Torts, which states: "[W]hen two or more persons acting

independently caus[e] a distinct or single harm for which there is a reasonable basis

for division according to the contribution of each, each is subject to liability only for

the portion of the total harm that he has himself caused." §§ 443A, 881 (1976);

Prosser, Law of Torts, at 313-14 (4th ed. 1971). On the other hand, "where two or

more persons cause a single and indivisible harm, each is subject to liability for the

entire harm." Restatement (Second) of Torts § 875; Prosser, at 315-17.

**70.** Moreover, apportionment is also improper where "either cause would have been sufficient in itself to bring about the result, as in the case of merging fires which burn a building." *NCR*, 688 F.3d at 839 (citing Restatement (Second) of Torts § 433A(2) at cmt. I); *see also* Steve C. Gold, Dis-Jointed? Several Approaches to Divisibility After Burlington Northern, 11 VT. J. ENVT'L L. 307, 351 (2009) (stating "at common law and under the Second Restatement, parties responsible for multiple sufficient causes of harm faced joint and several liability for the entire resulting harm").

**71.** The burden is on the party seeking apportionment to "prov[e] that a reasonable basis for apportionment exists." *Burlington*, 556 U.S. at 614; *see also* Restatement (Second) of Torts § 433B(2) ("Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."). The policy behind this is that "between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former." Restatement (Second) of Torts § 433B.

**72.** Divisibility may be based on a "variety of factors including volumetric, chronological, or geographic considerations, as well as contaminant-specific considerations." *ITT Industries, Inc., v. Borgwarner, Inc.*, 700 F.Supp.2d 848, 877 (W.D. Mich. 2010). The Seventh Circuit has stated that "contamination traceable to

each defendant" is a proper measure of harm. *NCR*, 688 F.3d at 841. That said, "courts have refused to make an arbitrary apportionment for its own sake." *Burlington*, 556 U.S. at 614.

73. "Equitable considerations play no role in the apportionment analysis; rather apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs." *Id.* at 615 n. 9.

74. Throughout this analysis, the court must keep in mind that divisibility is the exception, not the rule. *Capital Tax*, 545 F.3d at 535; *see also Metropolitan Water Reclamation Dist. of Greater Chicago*, 473 F.3d 824, 827 n.3 (7th Cir. 2007) ("The only exception to joint liability is when the harm is divisible, but this is a rare scenario.").

75. Whether the harm is capable of apportionment is a question of law, but the court's decision will rest on underlying findings of fact, such as the type of pollution at issue, who contributed to the pollution, etc. *NCR*, 688 F.3d at 838.

76. Ross has not met its burden of showing that the harm here is theoretically capable of apportionment. Just as the Seventh Circuit held in *NCR*, this is an example of multiple sufficient causes of an environmental harm. In *NCR*, the government's expert testified that the PRP's contributions of contaminants into a polluted river would, alone, have required approximately the same remedial measures. *Id.* at 839. The PRP did not set forth any evidence refuting this contention. Accordingly, the Court found the underlying harm was not divisible. *Id.* So too here, Mundell testified that because he found "very high levels of PCE relative to . . . acceptable

regulatory levels," even a quarter of the PCE released from Norge Dry Cleaning would have required the same investigation and remediation. (Trial Tr. at 106-07). Mundell based this conclusion on his 30 years of experience, in which he has observed small amounts of chlorinated solvents create very large problems that required remediation. (*Id.*). Though the evidence does not reflect to a reasonable degree of certainty the time of ownership for either Ellison or Ross, this percentage is roughly the same amount of time Ross operated Norge Dry Cleaning.[4] Ross did not present any evidence refuting this assertion. Like *NCR*, Ross's contributions of PCE alone would have required remediation to the Site. Thus, the harm is not capable of apportionment.

### b. Factual Basis for Apportionment

**77.** Assuming *arguendo* that the harm is theoretically capable of being divided, Ross has not presented a reasonable factual basis for apportionment.

**78.** This is a question of fact for the court, and calculations for apportionment need not be precise. *NCR*, 688 F.3d at 842 (citing *Burlington*, 556 U.S. at 617-18). Ross relies heavily on *Burlington Northern*, but the Seventh Circuit acknowledged that this did not replace an "evidence-based apportionment calculation." *NCR*, 688 F.3d at 842.

---

[4] The parties stipulated that Ross operated Norge Dry Cleaning from December 21, 1970 until approximately 1974 or 1975. (Joint Stip. ¶ 3). Thus, at minimum, Ross ran the dry cleaning business for at least 3 years. Though there is uncertainty as to when the Ellisons opened their business, multiple environmental assessments found the business opened at least by 1964. (Trial Ex. 4 at 2; Trial Ex. 20 at 11). Thus, at minimum, the Ellisons operated the dry cleaning business for at least 7 years. Accordingly, assuming PCE contamination could be determined by the time period operating the store alone, as Ross has argued for, Ross would account for at least 30% of the PCE released into the Site.

**79.** Ross has not set forth any evidence for the court to make this calculation.  Though it relies on time-on-the-site apportionment, it did not produce enough evidence to establish when Norge Dry Cleaning began operations or when it ceased.  The court cannot not make a time-based calculation without a start and end date.

**80.** Ross also failed to produce evidence comparing the periods of operation by Ellison and Ross as to potential PCE leakage and use.   Ross did not present any evidence regarding the amount of PCE used, the volume of laundry cleaned, the leakage rates or spills during these periods, or any other factual basis for the court to apportion the damages; rather, Ross relies simply on a guesstimate of when operations were conducted by Ross and Ellison.

**81.** Accordingly, Ross failed to meet its burden in presenting a reasonable factual basis for apportionment.  *See PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 183 (4th Cir. 2013) *cert. denied*, 134 S. Ct. 514 (U.S. 2013) ("Denying apportionment because a party fails to provide reliable evidence as to one of the factors informing apportionment is in no way at odds with *Burlington Northern*.")

**82.** The evidence here does not support the "rare" scenario where the harm is divisible. Ross is therefore jointly and severally liable for all of Padgett Brother's past costs under CERCLA § 107(a).

### B. Equitable Allocation Under CERCLA Section 113(f) and the ELA

#### 1. Standards

#### a. CERCLA Section 113(f)

**83.** Section 113(f) of CERCLA states: "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) . . . In resolving allocation claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).  In this manner, "contribution actions allow jointly and severally liable PRPs to recover from each other on the basis of equitable considerations." *Burlington*, 556 U.S. at 615 n. 9.

**84.** Equitable factors a court may consider include:

> (1) the relative fault of the parties;
>
> (2) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
>
> (3) the amount of the hazardous waste involved;
>
> (4) the degree of toxicity of the hazardous waste involved;
>
> (5) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment;
>
> (6) the financial resources of the parties involved;
>
> (7) responsible party's degree of involvement in disposal of hazardous waste, amount of hazardous waste involved, and degree of care exercised by the parties;

(8) the benefits received by the parties from contaminating activities; and

(9) the knowledge and/or acquiescence of the parties in the contaminating activities;

*Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508-10 (7th Cir. 1992).

### b. ELA

**85.** Similarly, the ELA states: "In resolving an environmental legal action, a court shall allocate the costs of the removal or remedial action in proportion to the acts or omissions of each party, without regard to any theory of joint and several liability, using legal and equitable factors that the court determines are appropriate, including the following:

(1) The degree of care exercised by each party with respect to the release of the hazardous substance or petroleum caused or contributed to by each party.

(2) The amount and characteristics of the hazardous substance or petroleum that was released.

(3) The risks posed by the hazardous substance or petroleum based on the use of the site at the time the hazardous substance or petroleum was released into the environment and the cost effectiveness of the removal or remedial action to address the risks.

(4) Whether a party's acts or omissions violated a federal, state, or local statute, rule, regulation, or ordinance.

(5) The extent to which each party exercised actual and direct managerial control over the site where the hazardous substance or petroleum was released at the time of the release.

(6) Whether an award of reasonable costs, including attorney's fees, to a party involved in the environmental legal action is appropriate.

> (7) Other equitable factors, including unjust enrichment, that the court determines are appropriate."

Ind. Code § 13-30-9-3.

## 2. Application

### a. Padgett Brothers

**86.** Padgett Brothers is not a responsible party under CERCLA §§ 107(a)(1) and 107(a)(2). Padgett Brothers never used chlorinated solvents at the Site, purchased the Site with no actual knowledge of the contamination, and has cooperated with IDEM in cleaning up the contamination. At bottom, Padgett Brothers' actions have not contributed to the contamination on the Site but have instead led to cleaning the Site. Thus, Padgett Brothers is not subject to any contribution for the expenses.

**87.** Ross contends Padgett Brothers is a responsible party under CERCLA § 107(a) simply for being the current owner of the contaminated Site. *See* 42 U.S.C. § 9607(a)(1); *but see Taylor Farm Ltd. Liab. Co. v. Viacom, Inc.*, 234 F. Supp. 2d 950, 966 (S.D. Ind. 2002) ("being the current owner of a hazardous waste site does not make [the owner] automatically liable for response costs under CERCLA"). As discussed above, despite having an environmental assessment performed on the Site, Padgett Brothers did not have actual knowledge of the contamination at the time of purchase. In addition, none of the pollution occurred while Padgett Brothers owned the property. *See PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 616 (7th Cir. 1998) (finding district court's decision to make previous landowner 100 percent responsible for cleanup costs was reasonable where current landowner's contribution

to contamination was likely too inconsequential to significantly affect the costs of cleaning up). Accordingly, when balancing the equities, the court does not find this factor supports contribution from Padgett Brothers.

88. Next, Ross also argues that Padgett Brothers is a responsible party under CERCLA § 107(a)(2) because it: (1) failed to perform environmental due diligence when it learned of potential issues caused by a former dry cleaner; (2) did not report to IDEM or evaluate the contamination when it first learned of it in 2008; and (3) exacerbated contamination when it installed a trench drain, which allowed SEW to flush water down the sewer pipe that was a source of PCE contamination migration.

89. Before purchasing the Site, Padgett Brothers had a Phase I Assessment done and reviewed this with its business attorney. (Trial Tr. at 12-14; Trial Ex. 3). The report "did not identify information or documentation that would suggest that a release of hazardous material has occurred at the Site." (Trial Ex. 3). To be sure, the report also warns that a dry cleaning establishment formerly operated on the Site, so the potential for soil/ground water contamination existed. (*Id*.). With the benefit of hindsight, an additional environmental assessment of the Site would have been invaluable to Padgett Brothers. When assessing Padgett Brothers' actions at the time of entering the deal, however, the court finds it reasonably relied on the statement that no hazardous materials had been released on the Site.

90. Similarly, Padgett Brothers' decision to locate the responsible parties for the contamination, rather than alert the government of the contamination or conduct further investigation, was reasonable under the circumstances. At the time Padgett

Brothers obtained the August Mack Phase II Report, Padgett Brothers had no knowledge that the contamination was located off-site and thus, could not be held responsible for allowing the plume to spread. (Trial Tr. at 43). In addition, Padgett Brothers first made a demand on Ross to clean up the contamination in 2009, approximately three years before Ross stepped in to conduct its own investigation. (*Id*. at 26). On these facts, Padgett Brothers is not a responsible party.

**91.** Lastly, Ross failed to present admissible evidence that the trench drain installed by Padgett Brothers exacerbated the contamination due to the flushing of water in the sewer pipes. Specifically, Flavin testified that a large volume of water being flushed through a sewer that is contaminated with residual PCE would exacerbate the spread of groundwater contamination. (*Id*. at 165). Flavin's conclusion, however, is based on mere speculation and guesswork. Indeed, Flavin did not take any sampling inside the sewer pipes; did not know if there was residual PCE inside the sewer pipe as of 2008; and did not know with any certainty whether there was residual PCE in the backfill of the sewer after 2008. (*Id*. at 179-80). Moreover, Flavin did not have any information on how the building was used, such as water usage or how often equipment was washed. (*Id*. at 181). Ultimately, the court does not find Flavin's theory credible, as it is based almost entirely on speculation and does not have a reliable foundation in data.

### b. Ellison

**92.** Ross also contends that the Ellisons are responsible parties under CERCLA 107(a)(1) and 107(a)(2). The Ellisons are not a party to this suit, as they have since passed away. (*Id*. at 131).

**93.** Insurance policies owned by the Ellisons, including policies related to the operation of Norge Dry Cleaning during the period they owned the land, have not been located. (*Id*. at 132).

**94.** In *United States v. NCR. Corp*., the court noted noted the dramatic increase in a responsible party's ultimate liability that may occur where it is found joint and severally liable but the other responsible party is insolvent. 960 F. Supp. 2d 793, 797 (E.D. Wis. 2013). Despite this acknowledgement, the court stated that "an innocent plaintiff should not suffer the wrong caused by an insolvent wrongdoer when another wrongdoer is also liable." *Id*. The court found this result promoted CERCLA's policy of ensuring that costs of cleanup efforts are borne by those responsible for that contamination. *Id*. (citing *Burlington*, 556 U.S. at 602). The court agrees with this rationale. Ross may still seek contribution from the Ellisons or any other responsible party to the contamination of the Site, but the court will not decide what percent is attributable to those non-parties at this time.

**C. Past Costs**

**95.** As to the costs Padgett Brothers have incurred to date, the court finds that all such costs are recoverable from Ross.

**96.** The NCP sets guidelines and procedures for responding under CERCLA to releases of hazardous substances, pollutants, or contaminants. *Vill. of DePue, Ill. v. Exxon*

*Mobil Corp.*, 537 F.3d 775, 779 (7th Cir. 2008) (citing 42 U.S.C. § 9621(f)). To recover some response costs under CERCLA, a plaintiff must show that it incurred the costs in compliance with the NCP. *PMC*, 151 F.3d at 616 (citing 42 U.S.C. § 9607(a)(4)(B)). "The involvement of a state environmental agency in approving cleanup plans and monitoring remediation progress satisfies the [CERCLA] requirement of consistency with the NCP." *City of Gary v. Shafer*, No. 2:07-cv-56, 2009 WL 1605136, at * 14 (N.D. Ind. June 2, 2009).

97. "The ELA requires only that the costs sought be 'reasonable.'" *Reed v. Reid*, 980 N.E.2d 277, 288 (Ind. 2012).

98. Additionally, the amounts recoverable in a CERCLA action shall include interest. 42 U.S.C. § 9607(a). Similarly, prejudgment interest is recoverable under Indiana law. *See, e.g.*, Ind. Code § 34-51-4-1.

99. Based on the testimony and evidence presented at the hearing, the costs incurred by or on behalf of Padgett Brothers are consistent with the provisions of CERCLA and the ELA for recoverability. Thus far, Padgett Brothers has incurred costs related to dirt removal, Site investigation, environmental consulting, IDEM oversight, legal fees, and litigation expenses. This work will continue to be done under IDEM's supervision and pursuant to the terms of the VRA between IDEM and Padgett Brothers.

100. Ross contends that $5,400 of Padgett Brothers' costs is not reasonable or necessary and thus, is not recoverable. (Trial Tr. at 160). In support, Flavin reviewed Mundell's investigation, soil borings, and monitoring wells and submitted a

supplemental expert disclosure regarding whether Mundell's actions were reasonable and necessary pursuant to IDEM's Remediation Closure Guide. (*Id*. at 159-60; Trial Ex. 26). Flavin opined that the on-site work did not appear to be done correctly in terms of assessing the vapor intrusion risk, though he did agree that it needed to occur. (Trial Tr. at 167). In particular, Flavin questioned the need for additional wells at various locations on- and off-site.

101. Though Flavin criticized their usefulness in conducting a risk-based assessment of the Site, he did not consider whether those wells could be helpful and necessary in the future when assessing a remedy. (*Id*. at 173-74). Moreover, Flavin admitted that he has "evaluated hundreds of sites with chlorinated and volatile organic compounds before, and . . . [he] has never seen a setup . . . where there was unexpectedly contamination going through a fairly small area as this." (*Id*. at 187). Flavin even agreed that Mundell needed at least some of the wells to determine the extent of the contamination. (*Id*.) ("Q: That's why Mundell had to put the wells in he had to put in, right, because he had to find out if it was there? A: Some of the wells, yes."). At bottom, the court finds Flavin's arguments unconvincing.

102. The disputed costs are reasonable and necessary and thus recoverable under CERCLA and the ELA.

103. Accordingly, Ross is required to pay the following past costs:

- August Mack Environmental       $4,900.00     (Trial Ex. 6)
- Delaware Construction and Landscape   $920.00     (Trial Ex. 7)
- IDEM                               $1,000.00     (Trial Ex. 8)
- IDEM                               $846.61     (Trial Ex. 11)
- IDEM                               $1,313.10     (Trial Ex. 11)

- Mundell & Associates, Inc.  $2,526.50  (Trial Ex. 14)
- Mundell & Associates, Inc.  $35,126.44  (Trial Ex. 14)
- Mundell & Associates, Inc.  $15,790.19  (Trial Ex. 14)
- Mundell & Associates, Inc.  $8,909.92  (Trial Ex. 14)
- Mundell & Associates, Inc.  $8,109.25  (Trial Ex. 14)
- Mundell & Associates, Inc.  $168.75  (Trial Ex. 14)
- Mundell & Associates, Inc.  $37,646.96  (Trial Ex. 14)

**104.** The total of these costs is $117,257.72. In addition, the court finds Ross is liable for interest on Padgett Brothers' past costs. Ross must pay Padgett Brothers interest on the past costs listed above in accordance with CERCLA and the ELA.

**D. Future Costs**

**105.** Padgett Brothers anticipates additional costs as the investigation and cleanup continue. This work will continue to be done under IDEM's supervision and pursuant to the terms of the VRA between IDEM and Padgett Brothers. Padgett Brothers thus seeks a declaratory judgment against Ross for all of Padgett Brothers' future, reasonable and necessary costs of investigation and remediation.

**106.** Flavin testified that it is not possible to determine whether future costs to remediate the Site are reasonable and necessary because (1) they have not yet been incurred; (2) the Site is not "fully characterized yet"; and (3) a Remediation Work Plan has not been developed. (Trial Tr. at 163).

**107.** Padgett Brothers seeks declaratory relief to recover all reasonable and necessary future costs, which are recoverable under CERCLA and the ELA. To that end, the court grants Padgett Brothers declaratory relief as to future costs that meet these standards. *See PMC*, 151 F.3d at 616 (finding allocation of cleanup costs before they

29

have occurred is proper, as it economizes on judicial time and lets the parties know at the earliest opportunity where they stand).

108.    If a dispute arises between the parties as to whether future costs incurred by Padgett are recoverable under the ELA and/or CERCLA, the court maintains continuing jurisdiction to resolve such issues.

### E. Attorneys' Fees

109.    Parties have agreed to determine the reasonableness of attorney's fees in later briefing.

### III. CONCLUSION

Ross has not carried the burden to show there is a reasonable basis for apportionment; thus, joint and several liability is appropriate for Ross. Padgett Brothers is not a responsible party for the contamination and should not be allocated any of the harm. All costs already incurred by Padgett Brothers have been necessary and reasonable. The court grants Padgett Brothers declaratory relief as to future costs that are recoverable under CERCLA and the ELA.


**SO ORDERED** this 17th day of July 2014.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.